# STATE OF NORTH CAROLINA

_____ WAKE _____ County

File No. 21CV005801

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name Of Plaintiff |
| --- |
| TOTAL MERCHANT SERVICES, LLC |

| Address |
| --- |

| City, State, Zip |
| --- |

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

**VERSUS**

| Name Of Defendant(s) |
| --- |
| TMS NC, INC. and CHRISTOPHER COLLINS |

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| --- | --- |
| TMS NC, INC. | Christopher Collins |
| c/o Christopher Collins, Registered Agent | 12505 Richmond Run Drive |
| 12505 Richmond Run Drive | |
| Raleigh          NC     27614 | Raleigh          NC     27614 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles! Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
| --- | --- | --- |
| Thomas H. Segars | 5/28/2021 | 3  ☐ AM  ☒ PM |
| Ellis & Winters LLP | Signature | |
| P.O. Box 33550 | | |
| Raleigh          NC     27636 | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
| --- | --- | --- |
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Signature | ☐ AM  ☐ PM |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE

COUNTY OF WAKE              SUPERIOR COURT DIVISION

                                     21 CVS _____

TOTAL MERCHANT SERVICES, LLC,

      Plaintiff,

                                   **VERIFIED COMPLAINT**

v.

TMS NC, INC. AND CHRISTOPHER          **Jury Trial Demanded**
COLLINS,

      Defendants.

Plaintiff Total Merchant Services, LLC, successor-in-interest to Total

Merchant Services, Inc. ("Plaintiff" or "TMS") for its complaint against Defendants

TMS NC, Inc. and Christopher Collins, alleges as follows:

## INTRODUCTION

1.     TMS markets and sells payment-card processing services and

programs to its customers through a nation-wide network of independent sales

representatives, including through Defendant TMS NC, Inc. ("Sales

Representative"). This is an action for enforcement by specific performance and

injunction of TMS's contract with Sales Representative and for further relief,

including damages, for Defendants' breaches of their contractual obligations.

2.     Sales Representative has a contract to market and sell payment-card

processing services and programs offered by TMS to various businesses. In 2018, in

consideration for higher payments, Sales Representative agreed to become TMS's

*exclusive* representative, marketing *only* TMS's services and programs, with limited exceptions not relevant in this action.

3.      As part of its agreement to market and sell TMS's services and programs, Sales Representative promised to grant TMS periodic inspection rights of its books, accounts, records, and files pertaining to Sales Representative's services. The inspection right is not contractually limited to any particular purpose. Among other things, the inspection right gives TMS the ability to confirm Sales Representative is complying with its contractual obligation to sell and market *only* TMS services and programs and not to solicit TMS's customers and prospective customers for competing programs.

4.      In January 2021, Sales Representative forwarded TMS an email between Sales Representative and a TMS customer. In the email, Sales Representative offered the customer a payment-card solution offered by TMS's competitors. The particular solution Sales Representative offered the customer is not offered by TMS, which instead offers a competing product from the product the Sales Representative offered the customer. The email evidences that Sales Representative is breaching its exclusivity agreement by selling services and products offered by TMS's competitors.

5.      On March 19, 2021, TMS sent an inspection demand to Sales Representative, invoking its contractual right to inspect Sales Representative's books, accounts, records, and files. The inspection would permit TMS to confirm and quantify Sales Representative's breach and, using information learned from the

inspection, act to protect its relationship and goodwill with its customers. Timely access to inspect Sales Representative's books, accounts, records, and files is necessary to protect TMS's rights, including its relationship and goodwill with its customer base.

6.     Citing no valid or good-faith justification, Sales Representative refused the inspection request. In the refusal, Sales Representative did not deny violating the exclusivity agreement.

<u>PARTIES</u>

7.     Plaintiff TMS is a limited liability corporation organized under the laws of Delaware and with its principal place of business in Troy, Michigan. TMS provides payment-card processing and related merchant services to businesses. TMS markets these services, in part, through a network of independent sales representatives. TMS is a successor-in-interest to Total Merchant Services, Inc., which is the entity that originally contracted with Defendants, and has the right to enforce the agreements at issue in this action.

8.     Defendant Sales Representative is a North Carolina corporation with its principal place of business in Raleigh, Wake County, North Carolina. Sales Representative is a successor-in-interest or otherwise is the legal successor of M&C Business Consulting Inc., a now-dissolved North Carolina corporation that originally signed the sales representation agreement at issue in this action.

9.     Defendant Christopher Collins is an officer and owner of Sales Representative and is a personal guarantor as to certain obligations in the relevant

agreements in this action. On information and belief, Collins is a resident of Wake County, North Carolina.

## JURISDICTION AND VENUE

10.     This Court has both personal jurisdiction over the Defendants and subject matter jurisdiction over this action.

11.     As it relates to the amount in controversy under N.C. Gen. Stat. § 7A-243 and for purposes of N.C. Gen. Stat. § 7A-45.4(a)(9), the value of the obligations, rights, and titles that Plaintiff seeks to enforce and protect includes each of (1) the value to Plaintiff of the exclusivity agreement (from which Plaintiff has derived and reasonably would be expected to continue to derive over $1 million in annual revenue); (2) the value of the right to receive the residual share (described below) to the Defendants (from which Defendants are paid on average more than $300,000 per month and, given the term of the exclusivity agreement, has exceeded and reasonably would be expected to exceed $1 million); (3) the amount of damages for Sales Representative's breach of the exclusivity agreement (which is unknown at this time, which will be determined at trial of this matter, but which is reasonably anticipated to exceed $25,000); and (4) Plaintiff's attorneys' fees, costs, and expenses, which Defendants are obligated to pay Plaintiff by contract, including the cost of investigation of Defendants' breaches of the exclusivity agreement and the inspection of Sales Representative's books and records.

12.     Venue is proper in Wake County under N.C. Gen. Stat. §§ 1-79 &   1-82.

## FACTUAL ALLEGATIONS

**TMS's Original Agreement with the Defendants**

13.     On February 20, 2008, TMS's predecessor entity, Total Merchant Services, Inc., entered into a Sales Representative Agreement (the "Agreement") with Sales Representative's legal predecessor, M&C Business Consulting Inc. ("M&C"). The Agreement was signed for M&C by Christopher Collins as M&C's "President" and Monica Collins as its "Secretary-Treasurer." A true and correct copy of the Agreement is attached to this Complaint as Exhibit A. On information and belief, in approximately 2010, M&C assigned or otherwise transferred its rights and obligations to Sales Representative.

14.     The Agreement requires TMS to compensate Sales Representative for Sales Representative's marketing and sales of TMS's products and services. The Agreement has more detail concerning the calculation of this compensation but, in short, the Agreement requires TMS to pay Sales Representative a percentage of the difference between (1) certain of the rates and fees charged to each business-customer Sales Representative solicits and secures on behalf of TMS, and (2) certain of the rates and fees that TMS pays to third party credit card associations (e.g., Visa and MasterCard) and other related vendors for those services. This percentage difference is sometimes referred to in the parties' agreements, correspondences, and in the industry as the "residual share."

15.     From just October 1, 2018 (the inception of the exclusivity agreement),through February 2021, Sales Representative was paid more than $9.4 million as its residual share, or more than $327,000 per month on average.

16.    In consideration for receiving the residual share and for the right to market and sell TMS's products and services, Sales Representative provided TMS with representations, warranties, and contractual commitments.

17.    In Paragraph 4(a) of the Agreement, Sales Representative covenanted, represented, and warranted that it would provide the Services (as defined in the Agreement) with "reasonable diligence, in a professional manner, [and] in accordance with all applicable Rules."

18.    In Paragraph 4(b), Sales Representative (abbreviated as "SR" in the Agreement) covenanted, represented, and warranted to provide current and updated credit reports, bank and trade references, and financial and other information semiannually for the first two years of the agreement and annually thereafter, with such information provided to TMS by February 1 of each year:

(b)  that SR will provide TMS current and updated credit reports (or the authorization to obtain such reports), bank and trade references, financial and other information on SR and its directors, officers, shareholders, partners or principals as TMS may reasonably request, during the term of the Agreement, as follows: (i) semiannually (by February 1 and August 1) for the first two years of this Agreement; and (ii) annually thereafter (by February 1).  All information furnished or to be furnished to TMS by SR is and shall be true, complete and correct in all respects.  SR will allow TMS or its representatives or regulators (including representatives of the Associations) access to the premises of SR upon reasonable notice at reasonable times with respect to the performance by SR of the Services.  During the term of this Agreement, and for a period of one year thereafter, representatives of TMS may, during normal business hours, make copies of SR's books, accounts, records and files pertaining to SR's performance of the Services.

19.    Also in Paragraph 4(b), Sales Representative covenanted, represented, and warranted that it is TMS's right, upon reasonable notice and at reasonable times, to access the premises of Sales Representative to inspect the books and records of Sales Representative. This inspection right is not limited by purpose and includes the right to "make copies of [Sales Representative's] books, accounts,

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 7 of 63

records and files pertaining to [Sales Representative's] performance" pursuant to

the Agreement:

(b) that SR will provide TMS current and updated credit reports (or the authorization to obtain such reports), bank and trade references, financial and other information on SR and its directors, officers, shareholders, partners or principals as TMS may reasonably request, during the term of the Agreement, as follows: (i) semiannually (by February 1 and August 1) for the first two years of this Agreement; and (ii) annually thereafter (by February 1). All information furnished or to be furnished to TMS by SR is and shall be true, complete and correct in all respects. SR will allow TMS or its representatives or regulators (including representatives of the Associations) access to the premises of SR upon reasonable notice at reasonable times with respect to the performance by SR of the Services. During the term of this Agreement, and for a period of one year thereafter, representatives of TMS may, during normal business hours, make copies of SR's books, accounts, records and files pertaining to SR's performance of the Services.

20. Finally, in Paragraph 4(d), Sales Representative covenanted,

represented, and warranted that it will keep "complete and detailed records relating

to the performance of the Services and its obligations under [the] Agreement,"

which records Sales Representative "shall make available upon request of TMS."

21. The inspection rights of Paragraphs 4(b) and 4(d) are of vital

importance to TMS. They permit TMS, for example, to ensure that its sales

representatives are complying with industry and card association rules, which is in

turn required for TMS to comply with its own obligations to the card associations

and pursuant to law.

22. The inspection rights also provide important safeguards with respect

to TMS's relationships with its customers, who ultimately contract with TMS or its

affiliates. Where, as happened here, a sales representative enters into an

exclusivity agreement with TMS and agrees to sell *only* TMS products and services,

the inspection right is critical to TMS's monitoring and enforcement of the

exclusivity agreement. TMS may have no way, absent the inspection right, to know

that a sales representative is violating the exclusivity agreement, diverting

customers or potential customers away from TMS to its competitors, and

permanently damaging TMS's relationship with those customers and its goodwill.

23.     In the event of an Event of Default[1] of the Agreement by Sales

Representative, TMS is permitted, among other things, to stop all payments to

Sales Representative of any residual share that would otherwise remain owing to

Sales Representative. *See* Exhibit A, ¶ 4(e).

24.     Finally, the Agreement also includes an indemnification provision in

which each party agrees to indemnify and hold the other party harmless from all

claims, loss, damages, expense, liability or judgments (including attorneys' fees and

costs) arising from or related to its acts or omissions and its breaches of the

Agreement. The indemnification clause requires Defendants to pay for TMS's costs,

including its reasonable attorneys' fees, for investigation and prosecution of

Defendants' breaches and this action.

## TMS's Exclusivity Addendum with the Defendants and Collins' Personal Guarantee

25.     In 2018, Defendants expressed a desire to earn and retain a higher

residual share percentage. TMS agreed to increase Sales Representative's residual

share to seventy percent if, and only if, Sales Representative agreed to become an

*exclusive* marketer and seller of TMS's services and products. Sales Representative

agreed.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Agreement.

26.     On October 1, 2018, the parties entered into an addendum to the Agreement (the "Exclusivity Addendum"). The Exclusivity Addendum amended the Agreement and is part of the Agreement. The Exclusivity Addendum is executed for Sales Representative by Collins, in his capacity as President of Sales Representative, and by Collins individually, as to certain portions of the Addendum. A true and correct copy of the Exclusivity Addendum is attached as Exhibit B.[2]

27.     In the Exclusivity Addendum, TMS agreed to pay Sales Representative a seventy percent residual share, subject to the terms of the Agreement as amended. The seventy percent residual share was an increase of at least five percent from the percentage of the residual share from the amount Sales Representative had been earning prior to the Exclusivity Addendum.

28.     In consideration for the higher residual share percentage, Sales Representative agreed, among other things, to become an exclusive marketer and seller of TMS's products, including that it would not in any capacity whatsoever, market, promote, or sell any processing program that competes (or would reasonably be expected to compete) with TMS's processing program (a "Competing Program"), with limited exceptions not relevant in this action.

29.     In addition, Sales Representative agreed that if it at any time violated its exclusivity obligation during such time as it received the 70 percent residual share, Sales Representative would pay to TMS an amount equal to the product of

---

[2] The version of the Exclusivity Addendum attached to the Complaint omits its voluminous Exhibit 2, which is a list of hundreds of merchant-customers relevant to certain guarantee commitments.

(a) ten percent, and (b) the amount by which (i) the rates and fees charged to and collected from all Qualifying Merchants (as that term was used in the Addendum) after October 1, 2018, exceed, (ii) the rates and fees that TMS pays to third parties (like Visa and MasterCard and certain third party vendors) with respect to those Qualifying Merchants after October 1, 2018. In the event Sales Representative fails to pay this amount in a timely fashion following appropriate demand, Sales Representative agreed to pay interest on the amount due plus the cost of any collection, including reasonable attorneys' fees. Sales Representative further gave TMS the express right to offset any such amounts owed against future compensation due by TMS to Sales Representative pursuant to the Agreement. The parties included this provision because they intended to liquidate damages upon a breach of the Exclusivity Addendum; the provision is a reasonable estimate of presumed actual damages; and, at the time of contract, it was difficult to estimate the amount of actual damages that would result from a breach.

30.     Further, Collins, in his personal capacity, agreed that he would be jointly and severally liable with Sales Representative to TMS for certain losses and acknowledged, confirmed, and reaffirmed in the Exclusivity Addendum that his personal guarantee, previously provided to TMS on or about April 12, 2018 ("Personal Guarantee), would remain in full force and effect.

31.     Finally, Sales Representative, on its behalf and on behalf of its officers and agents (including Collins), agreed to release and discharge TMS and certain of

its affiliates from all claims which Sales Representative or its officers and agents might have that accrued on or prior to December 31, 2017.

32.     TMS has performed under the Agreement as amended by the Exclusivity Addendum; since the effective date of the Addendum, TMS has paid Sales Representative more than $9.4 million as Sales Representative's residual share.

**Defendants' Breach their Contractual Commitments.**

33.     On January 27, 2021, Collins forwarded an email to TMS regarding a courtesy credit he was proposing be issued to a customer. The forwarded email included a chain of internal communications to Sales Representative. The first email in the chain included a direction from Collins to another employee of Sales Representative to "switch [the customer] over to the **Clover system** as you and I have discussed." (emphasis added). A true and correct copy of this email chain is attached as Exhibit C.

34.     On information and belief, the "Clover system" refers to a point-of-sale payment-card processing system manufactured by the Clover Network, Inc., a subsidiary of one of TMS's direct competitors. TMS provides products and services similar to the Clover system that directly compete with it, and the Clover system is not offered or supported by TMS. The Clover system is therefore a "Competing Program" that Sale Representative is prohibited by the Exclusivity Addendum from offering to TMS customers or potential customer.

35.     Concerned that Sales Representative is in violation of the Exclusivity Addendum, TMS on March 19, 2021, sent Sales Representative an inspection demand, invoking the relevant portions of the Agreement that require Sales Representative to permit TMS access to the premises of the Sales Representative for purposes of inspecting and copying Sales Representative's books, accounts, records, and files. The inspection demand complied with all notice provisions of the Agreement. The inspection demand specifically identified the concern that Sales Representative was in violation of the Exclusivity Addendum. A copy of the inspection demand is attached as Exhibit D.

36.     On March 31, 2021, TMS, through counsel, received a response from Sales Representative refusing to comply with the inspection right. The response provided no competent justification or excuse for the refusal, nor did it deny that Sales Representative is in breach of the Exclusivity Addendum. A copy of the refusal is attached as Exhibit E.

## COUNT I: BREACH OF CONTRACT AND OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Sales Representative)

37.     Plaintiff re-alleges and incorporates by reference paragraphs 1-36 as if fully set forth herein.

38.     The Agreement as amended by the Exclusivity Addendum is a valid and enforceable contract between TMS and the Sales Representative.

39.     Plaintiff has performed pursuant to the Agreement, and all conditions precedent to Sales Representative's performance under the Agreement, if any, have occurred or been performed.

-12-

40. Sales Representative has breached the Agreement by:

    a. Violating the Agreement by selling Competing Programs (as that term is defined in the Exclusivity Addendum).

    b. Refusing TMS's inspection rights of its premises and its books, accounts, records, and files pertaining to Sales Representative's performance of the Agreement, and refusing to provide complete and detailed records relating to the performance of the Services and its obligations under the Agreement upon TMS's request.

    c. By failing to provide current and updated credit reports, bank and trade references, and financial and other information semiannually for the first two years of the agreement and annually thereafter, with such information provided to TMS by February 1 of each year.

41. Sales Representative's deceptive conduct with respect to its breaches, including its bad-faith interference with Plaintiff's inspection rights, is a violation of the implied duty of good faith and fair dealing.

42. Plaintiff has been injured as a result of the breaches by an amount to be proven at trial.

## COUNT II: BREACH OF CONTRACT
### (Against Collins)

43. Plaintiff re-alleges and incorporates by reference paragraphs 1-36 as if fully set forth herein.

-13-

44.     The Personal Guaranty, as acknowledged, confirmed, and reaffirmed in the Exclusivity Addendum, and the Exclusivity Addendum itself are valid and enforceable contracts between TMS and Collins.

45.     Plaintiff has performed pursuant to the Personal Guaranty and the Exclusivity Addendum, and all conditions precedent to Collins's performance under the Personal Guaranty and the Exclusivity Addendum, if any, have occurred or been performed.

46.     Collins has breached the Personal Guaranty and the Exclusivity Addendum by failing to pay for the damages caused by Sales Representative's breaches as described herein.

47.     Plaintiff has been injured as a result of the breach by an amount to be proven at trial.

## COUNT III: INDEMNIFICATION
### (Against Sales Representative)

48.     Plaintiff re-alleges and incorporates by reference paragraphs 1-36 as if fully set forth herein.

49.     In the Agreement, Sales Representative agreed to indemnify and hold TMS harmless from all claims, loss, damages, expense, liability or judgments (including attorneys' fees and costs) arising from or related to its acts or omissions and its breaches of the Agreement.

50.     TMS has performed pursuant to the Agreement, and all conditions precedent to Sales Representative's performance under the Agreement, if any, have occurred or been performed.

-14-

51.     Sales Representative has breached the Agreement as described herein, causing Sales Representative loss, damage, and expense, including attorneys' fees and costs.

52.     Plaintiff is entitled to indemnification for these losses, damages, and expenses, including its reasonable attorneys' fees and costs, in an amount to be proven at trial.

## COUNT IV: DECLARATORY AND REQUEST FOR SPECIFIC PERFORMANCE AND PRELIMARY AND PERMANENT INJUNCTIVE RELIEF
### (Against Sales Representative)

53.     Plaintiff re-alleges and incorporates by reference paragraphs 1-36 as if fully set forth herein.

54.     The Agreement provides TMS an affirmative right, following appropriate demand, to enter Sales Representative's premises for the purpose of, among other things, inspecting and copying Sales Representative's books, accounts, records, and files pertaining to Sales Representative's services.

55.     TMS made a valid and good-faith demand on March 19, 2021, to inspect and to copy Sales Representative's books, accounts, records, and files pertaining to Sales Representative's services. The demand complied with the Agreement and all conditions precedent to the inspection right.

56.     Sales Representative has refused the inspection demand and has offered no good-faith basis or justifiable excuse for its refusal. Sales Representative's refusal is a breach of its express obligations under the Agreement to permit access to its books, accounts, records, and files. Sales Representative's

-15-

refusal and breach are hampering TMS's rights to investigate Sales Representative's separate breach of the exclusivity provisions of the Agreement and Sales Representative's suspect and unlawful solicitation of TMS's customers and potential customers for Competing Programs.

57. Absent equitable relief, TMS will continue to sustain certain injuries that cannot be adequately redressed by any monetary judgment, in that, among other things, TMS will forever lose its express, negotiated interim contractual rights to have access to Sales Representative's records to inform its related strategies, including, *inter alia*, to investigate continuing breaches by Sales Representative of its exclusivity commitments and to guard against Sales Representative's poaching TMS's customers and potential customers for Competing Programs. Absent equitable relief, TMS's ability to monitor and safeguard its reputation and goodwill with its customers will also continue to be compromised.

58. There is no remedy at law that will adequately compensate TMS for all injuries and harms sustained as a result of Sales Representative's breaches of the Agreement.

59. TMS is entitled to a summary and expedited order requiring inspection of the books, accounts, records, and files.

<u>COUNT V: DECLARATORY RELIEF</u>
<u>UNDER N.C. GEN. STAT. §§ 1-253 TO 1-267</u>
**(Against Sales Representative)**

60. Plaintiff re-alleges and incorporates by reference paragraphs 1-36 as if fully set forth herein.

61.     The Agreement provides TMS an affirmative right to terminate the Agreement upon the occurrence of an Event of Default. In the event of that the Agreement is terminated because of an Event of Default caused by Sales Representative, Sales Representative loses the right to receive any further residual share (from which Defendants earn on average more than $300,000 per month and, given the term of the exclusivity agreement, has exceeded and reasonably would be expected to exceed $1 million).

62.     Plaintiff seeks declaratory relief from the Court that the breaches of contract described herein constitute an Event of Default caused by Sales Representative pursuant to the Agreement, entitling Plaintiff to terminate the Agreement and cease all further payments of the residual share.

63.     Whether the Defendants have committed an Event of Default pursuant to the Agreement is in actual controversy and a declaration will provide the litigants with relief from uncertainty concerning their relevant legal rights.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiff prays for the following relief:

(1)     Specific performance of the Agreement, declaratory relief, and injunctive relief in the form of an order or orders that:

a. Orders Sales Representative, within seven days, to provide TMS full and unfettered access to its books, accounts, records, and files, including but not limited to all records set forth in TMS's attached written demand, for the purpose of inspecting and copying them;

-17-

      b. Orders Defendants to indemnify and exonerate TMS for all and from all losses, expenses, attorney's fees and legal fees including the fees and costs to litigate this request for specific performance and injunction;

(2)    a trial by jury on all issues so triable;

(3)    that judgment be entered in favor of Plaintiff and against Defendants in an amount to be determined by the jury at trial;

(4)    that Plaintiff be indemnified for all and from all expenses of litigation, including reasonable attorneys' fees, expenses, legal fees, and costs of investigation and litigation;

(5)    that the Court issue declaratory and injunctive relief with respect to the Agreement and the Exclusivity Addendum;

(6)    that the Court award such other and further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted, this the 28th day of April, 2021.

Thomas H. Segars
N.C. Bar No. 29433

**ELLIS & WINTERS LLP**
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone: 919-865-7000
Facsimile: 919-865-7010
Tom.Segars@elliswinters.com

Joshua P. Gunnemann
Georgia Bar No. 152250
(*pro hac vice* motion forthcoming)
**COUNCILL & GUNNEMANN LLC**
1201 Peachtree Street NE
Building 400, Suite 100
Atlanta, Georgia  30361-3507
Tel:  404-407-5250
Fax:  404-600-1624
jgunnemann@cogunn.com


*Counsel for Plaintiff*

DocuSign Envelope ID: 5F282E92-C8EC-48A5-8027-8243D0D863CD

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS _____

TOTAL MERCHANT SERVICES, LLC,

     Plaintiff,

v.

TMS NC, INC. AND CHRISTOPHER
COLLINS,

     Defendants.

**VERIFICATION**


**Jury Trial Demanded**

Pursuant to N.C. Gen. Stat. § 1A-1, Rule 11(b) and Emergency Directive 5 of the April 12, 2021 Order of the Chief Justice of the Supreme Court of North Carolina concerning the continuing operation of essential judicial functions in light of the COVID-19 outbreak, I, Kirk Haggarty, make this verification as follows:

    1.    I am over the age of 21 and am competent to provide this verification. I am Chief Financial Officer of Total Merchant Services, LLC, a position I have held since June 2017.

    2.    I have personal knowledge of Total Merchant Services, LLC and certain of its business activities, including those set out in the this Verified Complaint, based on my own experience and my review of Total Merchant Services, LLC's business records, including the exhibits cited in this Verified Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

    3.    The factual statements in this Verified Complaint concerning Total Merchant Services, LLC are true and correct to my knowledge, except as to those

DocuSign Envelope ID: 5F282E92-C8EC-48A5-8027-8243D0D863CD

matters stated on information and belief, and as to those matters, I believe them to be true.

* * * * *

I affirm, under penalties for perjury, that the foregoing representations are true and correct.

Executed on April ___, 2021

DocuSigned by:

Kirk Haggarty

# EXHIBIT A



payment solutions for your business

## Sales Representation Agreement

This Sales Representation Agreement ("Agreement") is made this **20** day of **Feb** _____,
200 **8** , by and between Total Merchant Services, Inc., a corporation organized under the laws of
Nevada, with offices at 255 Gold River Road, 3ʳᵈ Floor, Basalt CO 81621 ("TMS") and
_MEC Business Consulting Inc. corporation_ organized under the laws of
_North Carolina_ with its principal place of business at
_3021 Berks Way St 203 Raleigh NC 27614_ ("SR")

SR and TMS agree to the following definition of terms.

**"Account"** means a commercial checking account maintained by Merchant for the crediting of collected
funds and the debiting of fees and charges pursuant to the terms of this Agreement.

**"Agreement"** means this document.

**"Authorization"** means a computerized function or a direct phone call to a designated number to examine
individual Transactions to obtain approval from the Card Issuer.

**"Card"** means (i) a valid credit, debit or payment card issued under license from Visa U.S.A., Inc., Visa
International, Inc., or MasterCard International Inc., or (ii) any other valid credit, debit or payment card
accepted by Merchant under the terms and conditions of a separate Merchant Agreement.

**"Cardholder"** means the person whose name is embossed upon the face of the Card.

**"Card Issuer"** means the financial institution or company which has provided a Card to a Cardholder.

**"Chargeback"** means the procedure by which a Sales Draft (or disputed portion thereof) is returned by a
Card Issuer because such item does not comply with the Card Issuer's applicable operating regulations.

**"Imprint"** means (i) an impression on a Sales Draft manually obtained from a Card through the use of an
imprinter, or (ii) the electronic equivalent obtained by swiping a Card through a terminal and
electronically printing a Sales Draft.

**"Information"** means written agreements, sales literature, customer lists, pricing guidelines, management
reports, computer instructions, spreadsheets, templates, files of data and all related items which form the
knowledge base upon which TMS, its vendors, and Associations rely to operate their business
enterprises.

**"Merchant"** means each business solicited by SR and approved by TMS, that is a party to a Merchant
Agreement signed by such business and TMS.

**"Merchant Agreement"** means an agreement entered into between TMS and a Merchant pertaining to
Transactions by the Merchant.

**"Processing Program"** means the Card processing services and programs offered by TMS.

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 24 of 63

'Products" means all such goods and services, other items of tangible personal property and service contracts that are sold or rendered by Merchant.

"Rules" means all by laws, rules, operational regulations, procedures and guidelines promulgated by Visa USA, Inc. and MasterCard International Inc. (including but not limited to Visa Operating Regulations, MasterCard International Rules and MasterCard Member Service Provider "MSP" Rules), or any applicable regional or national credit or debit card association or network (each, an "Association"), and the operating manual and any written operating or underwriting guidelines of TMS with respect to the operation of the Processing Program (including changes thereto furnished from time to time by TMS to SR).

"Sales Draft" means the imprinted paper form evidencing a Transaction.

"Services" means those functions, duties, and responsibilities provided to TMS by SR, as delineated in Section 1 of this Agreement.

"Systems" means software, hardware, forms, documentation, instructions, policies, and all related items and information which are employed by TMS, its vendors, and the Associations in providing Card processing services and programs.

"Transaction" means any retail sale of Products, or credit for such, from a Merchant for which a customer makes payment through the use of any Card and which is presented for payment.

"Voice Authorization" means a direct phone call to a designated number to examine and obtain approval on an individual Transaction from the Card issuer.

For the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, TMS and SR agree as follows:

1.  Services to be Provided by SR:  During the term of this Agreement, SR will provide the following services (the "Services") to TMS regarding the Processing Program:

(i)  SR will actively market the Processing Program to businesses which engage in the sale of merchandise and/or services and desire to honor Cards, or financial institutions which wish to offer similar programs to such businesses.

(ii) SR will actively recruit businesses for TMS who meet TMS' eligibility criteria as described in its underwriting guidelines, as such guidelines may be modified, supplemented or substituted from time to time by TMS. Before proposing a business for application into the Processing Program, SR will screen such business in the manner described herein.

(iii)  SR will assist businesses in completing TMS' application. All businesses recruited by SR shall submit an application to TMS through SR. SR shall represent and warrant that each such application is genuine and valid and that SR is aware of no fact contrary to the information in the application.

(iv) SR will provide other ongoing support to TMS and Merchants for the intended operation of the Processing Program.

In connection with the provisions of the Services, any written solicitation materials referencing TMS and used by SR shall either be furnished by TMS or receive TMS' prior written approval. No materials utilized by SR shall state or imply that SR is participating in or conducting any activity precluded by the Rules.

2.  Approval or Rejection of Merchants:  TMS reserves the right, in its sole and absolute discretion, to approve or reject any business for inclusion into the Processing Program, and to terminate any Merchant at any time. The relationship created by a Merchant Agreement shall be owned exclusively by TMS, and

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 25 of 63

SR will act solely in the capacity of a service representative to Merchants, as directed by TMS. In order to preserve its rights hereunder, TMS may, from time to time, establish and approve terms, policies and/or procedures with respect to the Processing Program, including without limitation all business solicitation and application procedures and restrictions, business qualification criteria, Transaction processing procedures, customer service levels and all fees with respect thereto. SR shall at all times follow such terms, policies and procedures.

3. **Compensation and Liability to SR:** In consideration of SR performing the Services, SR shall receive compensation in the amounts and at the times described in Exhibit A. Such compensation shall be paid only for those Merchants (i) to which SR has rendered the Services, (ii) who complete and sign all required documentation, including the execution of a Merchant Agreement, (iii) who complete conversion and begin processing, and (iv) who were not previously operating under a Merchant Agreement. SR will assume no liability for any Chargeback that is attributable to or uncollectible from Merchants.

4. **Covenants, Representations and Warranties:** SR covenants, represents and warrants to TMS: (a) that SR is adequately experienced and trained to perform the Services, and will perform the Services with reasonable diligence, in a professional manner, in accordance with all applicable Rules. SR will also adhere to all applicable laws, rules and regulations, including but not limited to consumer protection laws.

(b) that SR will provide TMS current and updated credit reports (or the authorization to obtain such reports), bank and trade references, financial and other information on SR and its directors, officers, shareholders, partners or principals as TMS may reasonably request, during the term of the Agreement, as follows: (i) semiannually (by February 1 and August 1) for the first two years of this Agreement; and (ii) annually thereafter (by February 1). All information furnished or to be furnished to TMS by SR is and shall be true, complete and correct in all respects. SR will allow TMS or its representatives or regulators (including representatives of the Associations) access to the premises of SR upon reasonable notice at reasonable times with respect to the performance by SR of the Services. During the term of this Agreement, and for a period of one year thereafter, representatives of TMS may, during normal business hours, make copies of SR's books, accounts, records and files pertaining to SR's performance of the Services.

(c) SR is not under any obligation, contractually or otherwise, that would prohibit it from entering into and performing this Agreement.

(d) SR will keep complete and detailed records relating to the performance of the Services and its obligations under this Agreement, which it shall make available upon request of TMS at reasonable times and intervals. SR agrees to and will assist TMS in any regulatory examinations or proceedings related to the performance of this Agreement and businesses recruited by SR.

(e) SR will continue in business throughout the term of the Agreement, and maintain adequate financial capacity to operate its business.

(f) Neither SR, nor any officer, director, shareholder, partner or principal of SR, nor any person performing Services hereunder, has been convicted of a felony.

(g) Except as provided herein, SR will not directly enter into any agreements with Merchants relating to the Services or any other services or programs. SR will not be involved or have any interest in any settlement of funds transfer process between TMS, any Merchant or customers of Merchants. However, with the prior written consent of TMS, SR may offer to Merchants other services not offered by TMS or related to the Processing Program. TMS shall have no responsibility, obligation, or liability with respect to any such agreements or services. TMS shall not be liable to SR for any programs, services, or related fees or other charges payable by any Merchant to SR, and TMS is not a surety, guarantor or primary or third party obligor to any agreement between Merchant and SR.

(h) SR's performance of this Agreement will not violate any applicable law, rule, regulation or agreement to which SR may now or hereafter be bound.

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 26 of 63

(i) All persons associated with SR in the performance of the Services shall be bona fide employees of SR and, except to the extent specifically authorized by any Association or the Rules, shall not be an independent contractor or independent sales organization, unless registered by TMS.

(j) Except as disclosed in writing and attached hereto, neither SR nor any of its officers, directors, principals and owners: (a) is a party to any pending litigation; (b) has been subject to a fine or penalty of any Association (including with respect to the Rules); or (c) has been deregistered by any Association. SR will promptly notify TMS in writing of any such litigation, fine, penalty or deregistration during the term of this Agreement, and SR will be solely and exclusively responsible for any fine or penalty, and shall indemnify and hold TMS harmless, in respect thereof.

(k) SR is duly organized, validly existing and in good standing under the State or Commonwealth specified above. SR has full power and authority to operate its business and to enter into and perform this Agreement. SR has all necessary licenses and qualifications to conduct its business and perform its obligations hereunder. All necessary action to authorize, execute, deliver and perform this Agreement have been taken; and this Agreement constitutes the legal, valid and binding obligation of SR, enforceable according to its terms, and does not violate any charter documents, laws or any agreement to which SR is bound.

(l) SR represents that the sales and executive offices itemized in Exhibit C represent all of the sales offices of SR, and that no other office or any other sales organization shall submit business applications through any of these offices. SR understands that violation of this requirement would violate specific Association Rules and, therefore, is grounds for termination for cause by TMS. SR shall notify TMS in writing of its opening of any additional sales offices at least thirty (30) days prior to the date they are opened.

(m) SR represents that all of its owners, directors, principals, executive and financial management, and officers are all listed in Exhibit D. SR represents that this list represents all of the individuals who administer the financial, executive and strategic planning functions for SR. SR shall obtain TMS' approval in writing before adding different owners, directors, principals, executive or financial managers, or officers, with such approval to not be unreasonably withheld. SR understands that violation of this requirement is grounds for termination for cause by TMS.

5. Term and Termination: (a) Unless otherwise terminated as provided herein, this Agreement shall continue in effect for a period of three (3) years after the date hereof, and shall automatically renew for successive one (1) year periods, unless either party gives written notice of termination at least ninety (90) days prior to the next scheduled renewal date. Either party hereto may terminate this Agreement upon the occurrence of any "Event of Default" specified in Subsection 5(c) which is not cured as provided herein. In the event of termination, any Information, forms or materials in the possession or control of SR relating to Merchants or the Services to be performed hereunder shall be promptly returned to TMS.

(b) Notwithstanding the foregoing, the parties have the following rights: If Visa or MasterCard prohibits TMS or SR from providing the Services required by this Agreement, this Agreement will automatically terminate as of the effective date of such prohibition.

(c) Each of the following acts will constitute an Event of Default under this Agreement:

(i) Either party fails to pay the other party when due any payment, credit or other amount due under this Agreement, and such failure continues for a period of fifteen (15) business days after written notice has been sent to the nonpaying party.

(ii) Either party files for bankruptcy, insolvency, liquidation, or any similar proceeding, or has such a proceeding instituted against it, and the proceeding is not dismissed within 60 days.

(iii) Any representation or warranty made by a party to the other party is false or misleading in any material respect as of the date made, or becomes false or misleading at any time during the term of this

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 27 of 63

Agreement.

(iv) Either party fails to perform any material obligation or covenant specified in this Agreement, or in any terms, policies or procedures established pursuant to this Agreement, and such failure is not cured within thirty (30) days of written notice to the defaulting party specifying the breach, or SR violates Section 7 hereof and such violation continues for a period of five (5) business days after written notice has been sent to SR.

(v) Either party: (a) knowingly engages in activities which violate the Rules, or which cause the other party to violate the Rules; (b) operates in an unsafe, unsound manner, or commits fraud or suffers a material adverse change, financial or otherwise; or (c) engages in activities which result in undue economic hardship and/or damage to the goodwill of the other party.

(vi) SR or its representatives are employed in practices that involve elements of fraud or conduct that may be deemed to be potentially injurious to TMS or the Associations.

(vii) SR violates the provisions of paragraph 4 (l) and 4(m) of this Agreement.

(d) Upon the occurrence of an Event of Default, the nondefaulting party will have the right to: (i) immediately terminate this Agreement in whole or in part upon written notice; and (ii) pursue all other remedies available at law or in equity which the nondefaulting party may elect to pursue, either successively or concurrently, all such remedies being cumulative. In no event shall either party be liable for incidental, consequential, special or punitive damages or loss of profits.

(e) In the event that this Agreement is terminated other than because of the occurrence of an Event of Default caused by SR, TMS shall continue to pay to SR the compensation specified in Section 3 hereof for so long as SR remains in business under the same ownership or for so long as TMS continues to receive fees from Merchants whose Merchant Agreements were obtained by SR, whichever is shorter. Notwithstanding the above, after one year, TMS shall not be obligated to compensate SR for any month in which SR's earnings from this Agreement fall below $250. In the event that this Agreement is terminated because of an Event of Default caused by SR, SR shall receive no fees under Section 3 hereof after such termination.

(f) This Agreement shall automatically terminate in the event SR is deregistered by any Association or TMS ceases for any reason to be a member of any Association; provided however, that such termination shall only be effective with respect to that particular Association, unless and until either (i) all applicable Associations have deregistered SR or membership by TMS has ceased in all applicable Associations, and then the Agreement shall terminate in its entirety, or (ii) the party remaining in good standing gives written notice of termination of the entire Agreement to the other.

6. Independent Contractor Relationship: The relationship of TMS and SR is that of independent parties contracting for services only, and is not employer-employee, partner, principal-agent or joint venture. SR will not be entitled to participate in programs or benefits of TMS. SR is not an agent of TMS. SR has no authority whatsoever to bind TMS by representation, contract or agreement of any kind, or to incur any indebtedness or assume any obligations on behalf of TMS. SR will use reasonable care and judgment in the performance of this Agreement. SR will be solely responsible for all obligations and responsibilities incurred or assumed by SR.

7. Trademarks, Name, Servicemarks: (a) SR agrees to abide by the provisions of this Section regarding the use of TMS' names, trademarks, and servicemarks. During the term of this Agreement, SR may use the names or marks of TMS only as expressly authorized herein, or as otherwise provided by TMS by its prior, written approval. Any authorized use of the TMS names and/or marks shall be in a manner that is dignified and consistent with TMS' high corporate image standards. SR will not use the names or marks of TMS for any purpose not related to this Agreement. SR agrees that it is not acquiring any right, title or interest in the names or marks of TMS as a result of any authorized use hereunder, and SR acknowledges that TMS is the exclusive owner of its names and marks. Any such use authorized by this Section is not assignable or transferable. SR will take no action, or make use of TMS' names or marks, which will

damage or diminish TMS' goodwill or impair TMS' rights therein. SR shall, upon receipt of written notice from TMS, cease any act or practice that in TMS' opinion damages or diminishes its goodwill or impairs its rights. If, after such notice, SR fails to immediately cease any such act or practice, TMS may in its sole discretion revoke, cancel and terminate all of SR's rights of use granted hereunder by delivering a written notice of termination, which shall be effective on the date of receipt by SR. No use shall be made by SR of TMS' names or marks after the expiration or termination of this Agreement.

(b) SR acknowledges that each Association is owner of its respective names, trademarks, and servicemarks, that SR will not contest the ownership of such names or marks, and that SR will not use any such names or marks on its own behalf. Moreover, SR will not suggest, imply or in any manner create an impression that it is a member or an authorized representative of such Association or that it is other than a sales representative of TMS. SR may not create an impression that any such Association in any way endorses SR or the services which SR provides on behalf of TMS. Notwithstanding the foregoing, SR may use one or more Association names or marks subject to the condition that such names or marks are used in accordance with the Rules, and that the names and marks are used pursuant to the express written instructions of TMS, if such names or marks are used on SR's stationary, letterhead or business cards. SR shall not acquire any right, title or interest in any names or marks of any Association, and will take no actions which will diminish or damage the value or rights of any such names or marks. No use shall be made of the Association names or marks after expiration or termination of this Agreement; and the use of any names or marks shall be governed by applicable licensing agreements then in effect, and shall not be used in violation of such agreements. TMS or any Association shall have the right, immediately and without notice, to prohibit SR from performing any further service or activity related to the use of Association names or marks, should this Agreement be terminated or should SR violate any Rules or if SR is deregistered or terminated by any Association.

(c) SR agrees to use all Systems and other information identified or reasonably understood to be confidential or proprietary solely to perform its duties hereunder, and not for its own use or for any other purpose, and will treat such Systems and other confidential information in at least as careful and confidential a manner as SR treats its own confidential and proprietary information. SR agrees and acknowledges that access to any Systems and other confidential information does not convey to SR any right, title, interest or copyright therein, or any license to use, sell, exploit, copy or develop such Systems or confidential information, other than as authorized in connection with the provision of the Services, and SR will limit access to such Systems and confidential information to only those of its employees with a need to have access thereto to perform Services under this Agreement, and will maintain reasonable and appropriate safeguards to prevent the unauthorized access to or use of such Systems and confidential information. Upon request of TMS, its vendor, or any Association, or upon termination of this Agreement, SR agrees immediately to cease any and all use of Systems and confidential information, and to promptly deliver to TMS, its vendor, and any Association, all such Systems and confidential information that is in the possession or control of SR, and to immediately cease any and all use of such Systems and confidential information. SR will immediately advise TMS, its vendor, and any Association if any unauthorized person or external entity seeks access to the Systems or the confidential information, whether by legal proceeding or otherwise.

(d) SR acknowledges and agrees that any Association shall have the right, either in law or in equity, to enforce any provision of the Rules and to prohibit any and all SR conduct that creates a risk of injury to such Association or that may adversely affect the integrity of its Systems. SR agrees to refrain from taking any action that would have the effect of interfering with or preventing an exercise of such right by any Association. In the event of any inconsistency between any provision of this Agreement and the Rules, the Rules shall be afforded precedence and shall apply.

8. Indemnification: Each party agrees to indemnify, defend, save and hold the other party harmless from and against any and all claims, loss, damages, expense, liability or judgments (including attorneys fees and costs) arising from or related to (i) its acts or omissions (including those of its employees, agents, partners, principals, or representatives); (ii) failure to hold any necessary license, permit or authorization to conduct business or perform its obligations hereunder; (iii) breaches of this Agreement; (iv) any of its respective obligations to any Merchant and/or their customers or any other third party; (v) infringement of the name or mark of the other party or an Association; and (vi) any failure to fully comply with Association Rules.

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 29 of 63

9.   Non-Solicitation of Merchants: (a) During the period from the date of this Agreement to and including the fifth (5th) anniversary of the date of the termination of this Agreement, SR shall not, directly or indirectly, though any agent or representative, on behalf of himself or any other person or entity, in any capacity whatsoever, without the prior written consent of TMS, (i) cause or induce any Merchant to do business with any competitor of TMS or of Global Payments Direct, Inc., formerly known as National Data Payment Systems, Inc., a Georgia corporation ("Global"), or to cease doing business with, reduce business with, or divert business from TMS, or (ii) in any way interfere with the relationship between any of the Merchants, on the one hand, and TMS and/or Global, on the other hand, or attempt to do any of the foregoing.

(b) The prohibitions set forth in Subsection 9(a) above shall not apply where the Merchant independently solicits SR to terminate its processing relationship with TMS or Global, in which case SR is permitted to work with Merchant in finding a replacement processing program. However, prior to engaging in any such activity with a Merchant, SR shall first advise TMS in writing of the Merchant's decision, and as well provide a written explanation of the Merchant's decision, all in order to provide TMS a reasonable opportunity to communicate with and retain that Merchant.

(c) For each violation of the prohibitions set forth in Subsection 9(a) above, or of the notice requirements set forth in Subsection 9(b) above, TMS shall have the right to collect a default fee from SR equal to the greater of (i) $500, or (ii) the product of (x) 24, and (y) the average monthly commissions paid to SR over the three most recent months in which the Merchant actively processed with TMS and Global. In addition, five violations of either Subsections 9(a) or 9(b) above within a six (6) consecutive month period shall be deemed to be an Event of Default by SR under this Agreement, thus giving TMS the right to terminate this Agreement immediately on written notice to SR.

10.   Miscellaneous: (a) This Agreement and any rights or obligations hereunder may not be sold, transferred or assigned by SR, nor may SR delegate, subcontract, license, sublicense, assign, franchise or in any other manner extend or transfer any responsibility, right or obligation hereunder to any other person or party (other than to employees of SR to perform hereunder) without the express prior written consent of TMS.   In the event of the sale, merger, consolidation or other similar or significant event affecting the nature, ownership or control of SR, then any such change of control or successor by virtue of such event must be approved by TMS, such approval not be unreasonably withheld.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective and permitted successors and assigns.

(b) All exhibits attached hereto are an integral part of this Agreement and are expressly incorporated herein and made part of this Agreement.

(c)   Unless otherwise stated herein, the terms of the Agreement shall survive its expirations or termination.

(d) This Agreement may not be amended, modified or waived except in writing, signed by both parties. In the event of an inconsistency between the terms of this Agreement and any Association Rules, the Rules shall control and take precedence.

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 30 of 63

(e) All notices required to be given hereunder shall be in writing and shall be deemed to have been given or made when personally delivered, delivered by facsimile with an answer confirmed back or by express courier or mailed postage prepaid return receipt requested (unless a different address is designated).

If to SR :        M&C Business Consulting Inc
                  3921 Briks Whigs St 202
                  Raleigh NC 27614

If to TMS :       Total Merchant Services, Inc.
                  255 Gold River Road
                  3rd Floor
                  Basalt, CO 81621
                  ATTN: President

(f)   SR will not tie other services or programs to the Services or the Processing Program, without the express prior written consent of TMS. SR may not obtain from Merchants any assignments of any obligation of TMS to pay or reimburse Merchants for amounts arising from settlement of transactions under the Merchant Agreement. All Merchant Agreements will be executed by TMS, and SR shall not enter into any separate agreement with respect to any services provided by TMS for Merchants. SR may not collect funds due TMS from Merchants, and SR shall not have access to any Account or funds due Merchants.

(g)   Failure of either party to exercise or enforce its rights hereunder shall not be deemed as a waiver of such rights.

(h)   This Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado. If any provision of this Agreement is held to be invalid under any applicable statute or rule of law by a court of competent jurisdiction, it is to that extent deemed omitted and the validity of the remaining provisions shall not be affected thereby.

(i)   Neither party is responsible for failure or delay in performance caused by acts of God, strikes, flood, fire, war, public enemy, electrical or equipment failure, failure of third parties or any event beyond its reasonable control.

(j)   This Agreement constitutes the complete and exclusive statement of the Agreement between TMS and SR regarding the subject matter hereof and supersedes any prior communications and agreements whether written or oral.

IN WITNESS WHEREOF, the parties have executed and entered into this Agreement on the date written above.

Total Merchant Services            SR

By_____        By_Monica Collins_____

Name_____        Name Monica Collins / Christopher Collins

Title_____       Title Secretary-Treasurer / President

Attest_____        Attest_____

Date_____         Date 2-20-08

# EXHIBIT A

## COMPENSATION TO SR

**Amount of Compensation:**

**Option #1 - Buy Rate Program:** TMS shall pay SR 100% above the pre-established buy rates noted in Exhibit B.

**Option #2 – Revenue Sharing Program:** TMS shall pay SR 50% of the difference between the rates and fees charged to each Merchant and the rates and fees that TMS pays to Associations and vendors in respect of such Merchant, as described in Exhibit B. The monthly compensation will be calculated by taking the difference between the rate and fees charged to the Merchant and the rate and fees paid by TMS according to Exhibit B.

The selection of Option #1 or Option #2 shall be made by SR on a merchant-by-merchant basis, at the time the Merchant is approved by TMS.

To the extent that the SR selects Option #2, it will also participate in the following bonus programs:

A) Level I Bonus: In addition to the 50% revenue sharing program, SR shall receive 10% of all revenue streams received by TMS (the "Level I Bonus") on account of transactions generated by Retail Merchants, at the following levels:

   (i) If the SR activates a minimum of fifty (50) new Retail Merchants during any month commencing after the Start-Up Date, then the SR will receive the Level I Bonus on account of transactions generated by Retail Merchants during such month; and

   (ii) If the SR activates a minimum of five hundred (500) new Retail Merchants during any consecutive twelve (12) month period ending on an anniversary of the Start-Up Date, then the SR will thereafter receive the Level I Bonus until this Agreement is terminated in accordance with its terms; and

   (iii) If the SR activates a minimum of one thousand (1,000) new Retail Merchants during any consecutive twenty four (24) month period ending on the second anniversary of the Start-Up Date, or any anniversary thereafter, then the SR will receive the Level I Bonus until this Agreement is terminated in accordance with its terms.

   The SR shall be entitled to receive only one Level I Bonus at any one time, even if the SR has qualified for such bonus by meeting more than one of the thresholds set forth above.

B) Level II Bonus: In addition, the Level I Bonus will be enhanced as set forth below:

   (I) If the SR activates a minimum of one hundred (100) new Retail Merchants during any month commencing after the Start-Up Date, then the SR will receive, in addition to the Level I Bonus, 5% of all revenue streams received by TMS (the "Level II Bonus") on account of transactions generated by Retail Merchants during such month; and

   (II) If the SR activates a minimum of one thousand (1,000) new Retail Merchants during any consecutive twelve (12) month period ending on an anniversary of the Start-Up Date, then the SR will receive both the Level I Bonus and the Level II Bonus until this Agreement is terminated in accordance with its terms; and

   (III) If the SR activates a minimum of two thousand (2,000) new Retail Merchants during

any consecutive twenty four (24) month period ending on the second anniversary of the Start-Up Date, or any anniversary thereafter, then the SR will receive both the Level I Bonus and the Level II Bonus until this Agreement is terminated in accordance with its terms.

The SR shall be entitled to receive only one Level II Bonus at any one time, even if the SR has qualified for such bonus by meeting more than one of the thresholds set forth above.

C) <u>Level III Bonus</u>: In addition, the Level I Bonus and Level II Bonus will be enhanced as set forth below:

    (I) If the SR activates a minimum of one hundred fifty (150) new Retail Merchants and/or MOTO Merchants during any month commencing after the Start-Up Date, then the SR will receive, in addition to the Level I Bonus and Level II Bonus (to the extent said bonus levels are met), 10% of all revenue streams received by TMS (the "Level III Bonus") on account of transactions generated by Retail Merchants and MOTO Merchants during such month; and

    (II) If the SR activates a minimum of one thousand five hundred (1,500) new Retail Merchants and/or MOTO Merchants during any consecutive twelve (12) month period ending on an anniversary of the Start-Up Date, then the SR will receive the Level III Bonus (in addition to the Level I Bonus and Level II Bonus to the extent said bonus levels are met) until this Agreement is terminated in accordance with its terms; and

    (III) If the SR activates a minimum of three thousand (3,000) new Retail Merchants and/or MOTO Merchants during any consecutive twenty four (24) month period ending on the second anniversary of the Start-Up Date, or any anniversary thereafter, then the SR will receive the Level III Bonus (in addition to the Level I Bonus and Level II Bonus to the extent said bonus levels are met) until this Agreement is terminated in accordance with its terms.

D) <u>Level IV Bonus</u>: In addition, the Level I Bonus, Level II Bonus and Level III Bonus will be enhanced as set forth below:

    (I) If the SR activates a minimum of two hundred (200) new Retail Merchants and/or MOTO Merchants during any month commencing after the Start-Up Date, then the SR will receive, in addition to the Level I Bonus, the Level II Bonus and Level III Bonus (to the extent said bonus levels are met), 5% of all revenue streams received by TMS (the "Level IV Bonus") on account of transactions generated by Retail Merchants and MOTO Merchants during such month; and

    (II) If the SR activates a minimum of two thousand (2,000) new Retail Merchants and/or MOTO Merchants during any consecutive twelve (12) month period ending on an anniversary of the Start-Up Date, then the SR will receive the Level IV Bonus (in addition to the Level I Bonus, Level II Bonus and Level III Bonus to the extent said bonus levels are met) until this Agreement is terminated in accordance with its terms; and

    (III) If the SR activates a minimum of four thousand (4,000) new Retail Merchants and/or MOTO Merchants during any consecutive twenty four (24) month period ending on the second anniversary of the Start-Up Date, or any anniversary thereafter, then the SR will receive the Level IV Bonus (in addition to the Level I Bonus, Level II Bonus and Level III Bonus to the extent said bonus levels are met) until this Agreement is terminated in accordance with its terms.

For purposes of the bonus programs described above, the term "Retail Merchant" shall mean an Option #2 selected Merchant with a retail based discount rate; the term "MOTO Merchant" shall mean an Option #2 selected Merchant with a direct marketing/MOTO discount rate; and the term "Start-Up Date" shall

mean the earlier of (x) thirty (30) days after the date of this Agreement, or (y) the date that SR's first Merchant account is approved under this Agreement.

For purposes of the foregoing computations, the rates and fees charged TMS by Associations and vendors, as reflected in Exhibit B, are subject to change by such Associations and vendors at any time. These changes will be passed through to SR immediately, without prior notice to SR, and will also result in proportional changes to all of the fees referenced in Exhibit B.

Separately, SR may request an amendment to the fees charged to Merchants by giving written request of such amendment to TMS at least 30 days prior to the effective date of the amendment, provided Merchant has been given notice required under its Merchant Agreement. This request must also be accompanied with a newly signed Merchant Rates and Fees Schedule, signed by Merchant.

TMS reserves the right to offer additional bonus programs from time to time. Such additional bonus programs will be provided at the discretion of TMS, may be revised or terminated at the discretion of TMS, and will be published on the TMS website.

Timing of Compensation:

Compensation calculated for a month's Transactions shall be paid within thirty days (30) after the end of such month. At the time of each payment, or soon thereafter, TMS will provide a statement detailing the computations used by TMS in arriving at the compensation. The statement will include Merchant volume, rate and fees charged to the Merchant, and revenue generated for each Merchant. Any amounts owing TMS may be deducted from such compensation or TMS may directly bill SR.

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 34 of 63

## EXHIBIT B
## TMS/HSBC BANK PROGRAM
## COST STRUCTURE TO SR

OPTION #1 -- BUY RATE PROGRAM
You receive 100% of the discount, transactional and statement fee revenue in excess of pre-established buy rates

| BUY RATE PROGRAM FEES | |
|---|---|
| Discount Rate (Retail) | 1.64% |
| Network Communication Fee (Retail) | $0.05 (Above avg vianet) |
| Network Communication Fee (IP based processing over 25,000 per month) | $0.005* (over 1 basis point) |
| Discount Rate (MOTO) | 2.16% |
| Network Communication Fee (MOTO) | $0.15 |
| Statement Fee/Customer Service Fee | $5/month |
| Mid & Non-Qualified Surcharge Revenue | 25 basis points (to sub) |
| Debit Cards | $0.10 (+ network acquirer fee) |
| GPRS Wireless Activation Fee | FREE |
| GPRS Wireless Service Fees Using Nurit 8000 | $15/month (plus 3¢ 28 per item) |
| Amex Enrollment Bonus | $50 (per activated account) |
| Annual Fee (optional, only applies if you charge one) | $10.00 |
| Visa/MC Credit Card IC Per Item Fee  Pass Thru | $0.10 |
| Visa/MC Debit Card IC Per Item Fee  Pass Thru | $0.15 |

*Note: Accounts need to be sold with a $25 monthly minimum, and at least a $5 statement fee*
*\* Rate effective as of October 15, 2007*

## OPTION #2 - REVENUE SHARING PROGRAM

You receive 50% to 65% of the difference between the rates and fees charged to the merchant and the rates and fees paid by AmeriBanc National, LLC to its vendors and associations. By checking this option, you will share income on every available revenue stream.

| INTERCHANGE AND ASSESSMENTS PLUS NOTHING | |
|---|---|
| **AUTHORIZATION FEES** | |
| Global Payments (First & Central formerly MAPP) | $0.06 |
| Visanet | $0.05 |
| Non-Bankcard | $0.06 |
| IP based processing over 75,000 per month | $0.025* (1 of 1 base bentw) |
| **OTHER REVENUE SHARING PROGRAM FEES** | |
| Statement Fee/Customer Service Fee | $5/month |
| Debit Card | $0.10 (+ network input fee) |
| Chargebacks | $12.00 (per chargeback) |
| Retrieval Fee | $7.50 (per retrieval request) |
| Voice Authorization Fee | $0.50 (per call) |
| Batch Deposit Fee | $0.035 (per item) |
| Free Wireless Placement Statement Fee/Customer Service Fee | $10/month |
| GPRS Wireless Activation Fee | FREE |
| GPRS Wireless Service Fees Using Nurit 8000 | $15/month (plus $4.00 per term) |
| Amex enrollment bonus | $50 (per approved account) |
| Annual Fee (optional, only applies if you charge one) | $5.00 |
| Visa/MC Credit Card IC Per Item Fee Pass Thru | $0.10 |
| Visa/MC Debit Card IC Per Item Fee Pass Thru | $0.15 |
| **INTERNET PAYMENT GATEWAYS (IF APPLICABLE)** | |
| Authorize.net | $10/month (plus $9.00 per item over 250 items) |
| Authorize.net – Retail Swipe | $15/month (plus $9.00 per item) |
| Plug N Pay | $15/month |
| VeriSign Payflow Link | $15/month |
| VeriSign Payflow Pro | $95/month |
| **INTERNET GATEWAYS SETUP/LICENSE FEES** | |
| Authorize.net | FREE |
| Plug N Pay | FREE |
| VeriSign Payflow Link & Payflow Pro | $99 |
| **APPLICATIONS FEES** | |
| Application Fees | FREE |

*Rate effective as of October 15, 2007*

1-30-2008  Build #0035

Page 14 of 75

Case 5:21-cv-00240-M   Document 1-1   Filed 06/02/21   Page 36 of 63

**EXHIBIT C**
Offices of SR

1) _Christopher Collins_     _919-632-3037 (M)_
   Name                        Telephone

_12505 Richmond Run Dr. Raleigh Nc 27614_
   Address

2) _Monica Collins_     _919-632-0369 (M)_
   Name                        Telephone

_12505 Richmond Run Dr. Raleigh Nc 27614_
   Address

3) _____
   Name                        Telephone

   Address

4) _____
   Name                        Telephone

   Address

5) _____
   Name                        Telephone

   Address

6) _____
   Name                        Telephone

   Address

## EXHIBIT D
### Owners, Directors, Principals, Executive and Financial Managers and Officers

1) _Christopher Collins_     **PII**     _50_
Name          Social Security Number     % Ownership

_12505 Richmond Run DR_     _Sales & Development_
Home Address         Responsibilities/Status/Position

2) _Monica Collins_     **PII**     _50_
Name          Social Security Number     % Ownership

_12505 Richmond Run DR_     _operations_
Home Address         Responsibilities/Status/Position

3) _____
Name          Social Security Number     % Ownership

_____
Home Address         Responsibilities/Status/Position

4) _____
Name          Social Security Number     % Ownership

_____
Home Address         Responsibilities/Status/Position

5) _____
Name          Social Security Number     % Ownership

_____
Home Address         Responsibilities/Status/Position

Case 5:21-cv-00240-M    Document 1-1    Filed 06/02/21    Page 38 of 63

# EXHIBIT B

**ADDENDUM**
**to**
**Sales Representation Agreement, between Total Merchant Services, Inc. ("TMS") and**
**M&C Business Consulting Inc. ("SR"), dated February 20, 2008 (the "Agreement").**

THIS ADDENDUM (THE "ADDENDUM") SUPPLEMENTS AND AMENDS THE AGREEMENT, AS AMENDED BY A CERTAIN PRIOR ADDENDUM TO THE AGREEMENT MADE EFFECTIVE AS OF APRIL 1, 2016 (THE "PRIOR ADDENDUM"), AND IS MADE EFFECTIVE AS OF OCTOBER 1, 2018 (THE "EFFECTIVE DATE"). IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE AGREEMENT, THE PRIOR ADDENDUM AND/OR THIS ADDENDUM, THEN THE TERMS OF THIS ADDENDUM WILL CONTROL. CAPITALIZED TERMS USED BUT NOT DEFINED OR REVISED HEREIN WILL HAVE THE SAME MEANING AS IN THE AGREEMENT.

1.    Seventy (70%) Percent Residual Share. SR will receive seventy (70%) percent of the amount by which (a) the rates and fees charged to and collected from each Qualifying Merchant (as defined below), exceed (b) the rates and fees that TMS pays to the Associations and existing vendors in respect of such Qualifying Merchant (the "70% Residual Share Program"). SR shall not be entitled to receive, in addition to such seventy (70%) revenue share, any Level I, Level II, Level III or Level IV Bonuses with respect to any Qualifying Merchant, which bonuses are outlined in Exhibit A to the Agreement. For purposes of the foregoing, a "Qualifying Merchant" shall be defined as any Merchant (i) whose merchant application is submitted to TMS by SR for approval on or after October 1, 2018, (ii) who was, at no time prior to October 1, 2017, a party to a Merchant Agreement, and (iii) who participates in TMS' "Payments Hub" program (subject to such program being offered by TMS, and as modified by TMS from time to time), and who pays to TMS all fees assessed in connection with such participation.

Notwithstanding the foregoing, TMS reserves the right to terminate the 70% Residual Share Program at any time in its sole and absolute discretion, which shall be effective (the "70% Residual Share Program Termination Date") immediately upon notice to SR, upon the occurrence of either of the following events: (a) SR's or Chris Collin's violation of any of its or his respective obligations referenced under Sections 3 (1bps Loss Reimbursement), 4 (Exclusive Commitment) and 5 (100% Loss Reimbursement) below; or (b) SR's breach of any other obligation under the Agreement, the Prior Addendum and/or this Addendum. In the event of such termination, (i) the 70% Residual Share Program will not be available to SR after the 70% Residual Share Program Termination Date, and (ii) SR shall have the right to retain all amounts received on account of the 70% Residual Share Program on or prior to the 70% Residual Share Program Termination Date (subject to TMS' rights under Section 5 of the Agreement).

2.    Bonus Program: SR and TMS hereby agree to terminate the "Special Compensation Rights" outlined in Section 1 of the Prior Addendum, and to replace it with the "Peak Bonus & Free Equipment Placement Guidelines attached hereto as Exhibit 1. Such replacement shall be effective as of January 1, 2018.

3.    1bps Loss Reimbursement: In consideration for the 70% Residual Share, and for other good and valuable consideration, SR and Chris Collins each jointly and severally agree to reimburse TMS and its affiliated entities for all amounts which TMS pays to the Member Bank as a result of chargebacks, credit losses, retrievals, ACH rejects, transaction rejects, fee rejects, fines, or any

1

other payment obligations that are due to the Member Bank from each Merchant (collectively "Losses"), subject to the following limitations: (a) such reimbursement obligation applies only to those Merchants ("1bps Loss Reimbursement Merchants") that are not the subject of the continuing guaranty identified in Section 5 below ("100% Loss Reimbursement Merchants"); and (b) such reimbursement obligation shall only apply to Losses under this Section 3 during any calendar quarter that exceed the product of (i) 0.0001, and (ii) the total Card processing volume of 1bps Loss Reimbursement Merchants during such calendar quarter. The amount due to TMS under this Section shall be calculated by TMS on a quarterly basis, as of the end of each such calendar quarter. In the event that SR fails to pay such amount in timely fashion, then SR shall also pay interest on the amount due, calculated at 1.5% per month, plus costs of collection (including reasonable attorneys' fees), and TMS shall have the right, without limiting any other rights or remedies that it may have, to offset such amounts against future compensation due by TMS to SR under Section 3 of the Agreement.

4.    Exclusive Commitment: (a) In the absence of TMS' prior written authorization in each case (which may be granted or withheld in TMS' sole discretion), SR agrees that it will not, directly or indirectly through any Affiliate (as hereinafter defined) or in any capacity whatsoever, solicit, market, promote or sell any processing program that competes (or would reasonably be expected to compete) with TMS' Processing Program (a "Competing Program"), or solicit or encourage any businesses or financial institutions to join or apply for admission into any such Competing Program - it being the intent of the Agreement that SR shall submit to TMS all merchant card business that it secures, directly or indirectly through any Affiliate. For purposes of the foregoing, the term "Affiliate" of SR shall mean, at the time of such determination, (i) any independent sales representative, agent or partner of SR, (ii) any person or entity that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with SR, (iii) any officer, director, partner or employee of SR, or (iv) the spouse or children of any officer, director or equity holder of SR, or any other relative of such officer, director or equity holder who has the same home as such officer, director or equity holder; and for purposes of the definition of "Affiliate", "control", as used with respect to any entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such entity, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, SR is not obligated to refer merchant bank card business that it secures to TMS where the application submitted to TMS by SR in respect of a particular merchant is rejected or declined.

(b)    The foregoing exclusive commitment will continue for the entire term of the Agreement; provided, however, in the event that TMS terminates the 70% Residual Share Program under Section 1 above during such term for any reason other than (a) SR's or Chris Collin's violation of their respective obligations, as set forth under Sections 3 (1bps Loss Reimbursement), 4 (Exclusive Commitment) and/or 5 (100% Loss Reimbursement) below, or (b) SR's breach of any other obligation under the Agreement, the Prior Addendum or this Addendum, then SR shall have no further exclusivity commitment after the 70% Residual Share Program Termination Date, and such termination of exclusivity shall constitute SR's sole remedy by reason thereof at law or in equity.

(c)    In addition, in the event that SR at any time violates such exclusive commitment while it continues to participate in the 70% Residual Share Program, SR will pay to TMS an amount equal to the product of (a) ten (10%) percent, and (b) the amount by which (i) the rates and fees charged to and collected from all Qualifying Merchants after October 1, 2018, exceed (i) the rates and fees

2

that TMS pays to the Associations and existing vendors in respect of such Qualifying Merchants after October 1, 2018. The foregoing payment shall be made within ten (10) days of demand by TMS. In the event that SR fails to pay such amount in timely fashion, then SR shall also pay interest on the amount due, calculated at 1.5% per month, plus costs of collection (including reasonable attorneys' fees), and TMS shall have the right, without limiting any other rights or remedies that it may have, to offset such amounts against future compensation due by TMS to SR under Section 3 of the Agreement.

5.     100% Loss Reimbursement: SR and Chris Collins each hereby acknowledges, confirms and reaffirms its and their continuing obligations under that certain Personal Guaranty issued on or about April 12, 2018 (the "100% Guaranty"), and hereby agrees that its and his liability under that 100% Guaranty shall remain in full force and effect notwithstanding the execution and delivery of this Addendum, and shall apply, without limitation, to all Merchants listed in Exhibit 2 attached hereto.

6.     Term: The term of the Agreement, as set forth under Section 5(a), is hereby extended until the third (3rd) anniversary of the Effective Date set forth above, with automatic one (1) year renewals thereafter as set forth in Section 5(a), unless otherwise terminated as provided in the Agreement.

7.     Release: (a) SR, including each and every one of its past, present, or future officers, employees, agents, representatives, attorneys, successors, assigns, or any other person acting on its behalf or for its benefit, or any person claiming through it (collectively, "SR Releasors"), hereby jointly, severally and fully releases and discharges TMS, as well as its successors in interest and present, former, and future affiliates, parents, subsidiaries, officers, directors, agents, distributors, employees, owners, members, shareholders, general partners, limited partners, beneficiaries, representatives, attorneys, successors and assigns (with all the foregoing released parties in this paragraph being collectively referred to as the "TMS Released Parties"), from all causes of action, suits, claims, or demands, in law or in equity, known or unknown at this time, which the SR Releasors, or any of them, now have, did have, or may have in the future against the TMS Released Parties, or any of them, under any legal theory, whether or not alleged, related to or arising from any claims that SR is owed money or property (including without limitation compensation and/or commissions) from TMS in respect of Merchants and/or their respective Transactions for, on account of, or during any period occurring on or prior to December 31, 2017 (the "SR Claims").

(b)     TMS, including each and every one of its past, present, or future officers, employees, agents, representatives, attorneys, successors, assigns, or any other person acting on its behalf or for its benefit, or any person claiming through it (collectively, "TMS Releasors"), hereby jointly, severally and fully releases and discharges SR, as well as its successors in interest and present, former, and future affiliates, parents, subsidiaries, officers, directors, agents, distributors, employees, owners, members, shareholders, general partners, limited partners, beneficiaries, representatives, attorneys, successors and assigns (with all the foregoing released parties in this paragraph being collectively referred to as the "SR Released Parties"), from all causes of action, suits, claims, or demands, in law or in equity, known or unknown at this time, which the TMS Releasors, or any of them, now have, did have, or may have in the future against the SR Released Parties, or any of them, under any legal theory, whether or not alleged, related to or arising from any claims that TMS is owed money or property from SR in respect of Merchants and/or their respective Transactions for, on account of, or during any period occurring on or prior to December

3

31, 2017, or in regard to any fees collected directly from Merchants by SR in violation of the Agreement for "Payments HUB" or similar services delivered to Merchants on or prior to the Effective Date (the "TMS Claims").

(c)     Waiver of California Civil Code Section 1542. In giving the foregoing release, which includes claims that may be unknown to SR or TMS at present, SR and TMS each acknowledges that it has read and understands Section 1542 of the California Civil Code which reads as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

SR and TMS each understands that this Agreement includes a release of all known and unknown SR Claims and TMS Claims. SR and TMS each expressly waives and relinquishes all rights and benefits under the above-quoted section 1542 and any law of any jurisdiction of similar effect with respect to SR's or TMS' release of any unknown or unsuspected SR Claims and TMS Claims, as applicable.

8.      Other Agreement: TMS NC Inc., an affiliate of SR, is a party with North American Bancard, LLC, an affiliate of TMS, to an Agent Agreement, dated March 19, 2012 (the "NAB Agreement"). SR and TMS agree, for themselves and their affiliates, that the NAB Agreement remains in full force and effect and is not amended or modified in any way by the terms of this Addendum. No rights or remedies under the NAB Agreement are waived or released by either party thereto.

9.      Confidentiality: SR hereby covenants and agrees not to publish, file or record this Addendum and to maintain and to keep confidential the terms and conditions of this Addendum, except to the extent that disclosure is required by law. SR further agrees not to, and not to permit its affiliates, stockholders, officers, employees, directors, agents, advisors or representatives to, communicate, divulge or otherwise disclose any information with respect to the 70% Residual Share Program, or SR's right to receive such rights, to any person or entity, whether directly or indirectly.

10.     Execution: This Addendum may be executed in one or more counterparts, each of which will be deemed an original Addendum, but all of which will be considered one instrument and will become a binding Addendum when one or more counterparts have been signed by each of the parties and delivered to the other. A facsimile of this document bearing a party's signature or a printed copy of the original, signed document scanned in .pdf or .tiff format shall have the same legal force and effect as an original of such signature and shall be treated as an original document for evidentiary purposes.

[Remainder of Page Intentionally Left Blank; Signature Page to Follow]

4

Accepted and Agreed:

Total Merchant Services

By _____
       (sign)

Name _HIATT HENDONE_
              (print)

Title _EVP, SALES_

Date _10/18/18_

SR:

By _____
       (sign)

Name _Chris Collins_
                    (print)

Title _President_

Date _10/19/18_

Acknowledged and Confirmed as to
Sections 3 and 5:

Chris Collins

_____

Date _10/19/18_

5

# EXHIBIT 1

## PEAK BONUS & FREE EQUIPMENT PLACEMENT GUIDELINES

[See Attached]

# Peak Bonus & Free Equipment Placement Guidelines

| Peak Bonus | EPX | GLB/FD |
|---|---|---|
| Upfront Activation Bonus | $400.00 | $200.00 |
| Upfront Approval Bonus | $300.00 | $200.00 |
| Profitability Multiplier | 12x | 6x |
| Bonus Cap | $5,000.00 | $2,500.00 |

- Eligible for qualifying Merchants submitted 09/08/2017 forward.
- Eligible for all Merchant Types. Excluding PayAnywhere Mobile "Pay As You Go" (PAYG) Merchants. PAYG PayAnywhere Mobile Merchants will be eligible for a $50 flat Activation Bonus.
- Upfront Paid on Approval or Activation, you pick.
- No Pricing Requirements, price Merchants however you want!
- No Early Termination/Cancellation Fee required!
- Place Free Equipment with minimum $5 Monthly Basic Service Fee and $25 Monthly Minimum Discount Fee!
- If paid on Approval, approval bonus will be paid on the next business day after the merchant's approval.
- If paid on Activation, activation bonus will be paid on the next business day after the merchant activates. (Next business day payments may be subject to banking institutions' cutoff ACH requirements to allow for payment processing.
- Activation is defined as total batches deposited to merchant of $300 or more in volume. (Amex & Pin Debit not included in volume calculation)
- Next business day payments may be subject to banking institutions' cutoff ACH requirements to allow for payment processing.
- If the merchant does not activate within 60 days from the date of approval, or if the merchant stops processing and is not active (no authorization or settlement of merchant card transactions) for more than 30 consecutive days, is closed, or ACH rejects within twelve months from the date of the profitability bonus payment, total bonus will be recovered.
- Existing accounts and seasonal merchants are not eligible. One bonus per physical location only, with exception of Merchants with unique principals/fed tax ID's who meet program requirements (i.e. salon multi merchants).
- Profitability Multiplier Bonus calculation is based on the first full month (excluding December) of processing volume after the activation month. Example - Activation in February ($300 or more in volume) / Bonus calculation based on March volume. Our retained revenue will be multiplied by 12 (EPX) or 6 (Global Payments/First Data) up to $5,000 (EPX) or $2,500 (Global/First Data) and the difference between what you were already paid on approval or activation and what you are due or is due back will be debited/credited through the Profitability Multiplier Bonus report generated on or around 15th of each month.
- PCI, Payments HUB and similar non-processing fees shall be excluded from Profitability Bonus residual profit calculations.

## EXHIBIT 2

## LIST OF 100% GUARANTY MERCHANTS

[See Attached]

# EXHIBIT C



NorthAmerican BANCARD

Robb Smith <rssmith@nabancard.com>

## Re: GREAT FALLS EYECARE 3130032539191-Update on Refund

**David Greenberg** <dgreenberg@nabancard.com>
To: Ryan Malloy <rmalloy@nabancard.com>
Cc: Kirk Haggarty <khaggarty@nabancard.com>, Jim Parkinson <Jparkinson@nabancard.com>, Robb Smith <rssmith@nabancard.com>

Wed, Jan 27, 2021 at 5:05 PM

Adding Robb. We need to send out a letter to Chris on this issue.

On Wed, Jan 27, 2021 at 5:01 PM Ryan Malloy <rmalloy@nabancard.com> wrote:
: Please see 3 highlighted areas below. He accuses us of padding interchange, and attempts to solicit our existing merchant to move to a clover system.... a product we don't sell.

Side note, both Finance and Chris requested to reprice this merchant at the same time which caused them to be overbilled and a credit needed to be issued.

Thanks,

Ryan Malloy
SVP, Partner Sales
North American Bancard
m: 248.872.6911
rmalloy@nabancard.com
CONFIDENTIALITY NOTICE:
This email message and any attachments are only for the use of the intended recipient and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, distribution or other use of this email message or attachments is prohibited. If you have received this email message in error, please delete and notify the sender immediately, thank you.

-------- Forwarded message ---------
From: **Darren McCaffrey** <dmccaffrey@paymentshub.com>
Date: Wed, Jan 27, 2021 at 2:32 PM
Subject: Fwd: GREAT FALLS EYECARE 3130032539191-Update on Refund
To: Ryan Malloy <rmalloy@nabancard.com>

I have already handled the extra money on the refund to this merchant but please scroll down and read the emals where Clover is mentioned between Chris and Susan.

**Darren McCaffrey**
**Director, Partner Relations**
248.283.6269 | dmccaffrey@paymentshub.com

---------- Forwarded message ----------
From: CHRISTOPHER COLLINS <chris@tmsnc.com>
Date: Wed, Jan 27, 2021 at 9:59 AM
Subject: Re: GREAT FALLS EYECARE 313003253191-Update on Refund
To: Darren McCaffrey <dmccaffrey@paymentshub.com>

Darren, I know you calculated 5000.00 or so yesterday, but we're going to have to courtesy credit the remaining delta amount as a courtesy and he was expecting 1.98%. we can never seem to make a profit at that, and I assume its because our company pads interchange perhaps. There's no reason that this eyecare center can't be profitable at that rate when many other are profitable at rates lower than that that are eyecare centers.

Also, he just got burned for 2-2400.00 fraudulent charges and he's out 5000.00 or so of cash and his 22 pairs of sunglasses he shipped out to the fraudster as well.

Thanks,

Chris Collins

National Sales Director
Total Merchant Services

3021 Berks Way Ste 202

Raleigh, NC 27614
Cell 919-632-3037
Toll Free 800-823-2712 ext 102
Fax 888-488-4085

From: Daraius Unwalla <unwalla@verizon.net>
Date: Wednesday, January 27, 2021 at 9:52 AM

**To:** Susan Bobo <sbobo1234@gmail.com>, "chris@tmsnc.com" <chris@tmsnc.com>
**Subject:** Re: GREAT FALLS EYECARE 313003253919I-Update on Refund

Hi Guys,

I have been up since early this morning analyzing our monthly TMS reports from June 2020 thru December 2020. I calculated the amount that should have been debited from our bank account consistent with the 1.98% flat fee we had agreed to vs what we were actually debited for each month.

The delta between those two numbers came to a grand total of $6159.05. That is the correct amount that would need to be credited back to us to make us whole.

Thanks,

Dr. Daraius Unwalla

On Tuesday, January 26, 2021, 05:10:40 PM EST, Susan Bobo <sbobo1234@gmail.com> wrote:

Hi Dr Unwalla!

I wanted to get this information over to you promptly! Please see Chris's message below on the refund amount that you will be receiving within the next 48 hours!

Again, our apologies for the error and please let me know if you would like to receive the Clover system at no charge as we talked about earlier today! We will be happy to make that happen for you and Dr Runke! Thank you!!

Best Regards,

Susan A. Bobo

National Account Executive

Total Merchant Services

919.345.5042 (Direct)

888.488.4085 (Fax)



**Susan Bobo**
National Account
Executive
Total Merchant
Services

**From:** CHRISTOPHER COLLINS <chris@tmsnc.com>
**Sent:** Tuesday, January 26, 2021 4:50 PM
**To:** Susan Bobo <sbobo1234@gmail.com>
**Subject:** FW: GREAT FALLS EYECARE 313003253919 I-URGENT

Susan,

The official amount to be refunded is $4955.20 and it will hit Dr Unwalla's account within the next 48 hours.  Please relay my apologies for this error and let him know that I will be happy to switch him over to the Clover system as you and I discussed. Please  let me know if he'd like to move forward on that as soon as you can.

Thanks,

Chris Collins

National Sales Director
Total Merchant Services

3021 Berks Way Ste 202

Raleigh, NC 27614
Cell 919-632-3037
Toll Free 800-823-2712 ext 102
Fax 888-488-4085

NorthAmerican
BANCARD

David A. Greenberg
Chief Administrative Officer

p: 248-654-2315  c: 203-216-7562
a: 250 Stephenson Highway, Troy, MI 48083
w: www.nabancard.com  e: dgreenberg@nabancard.com

# EXHIBIT D



JOSHUA P. GUNNEMANN
Attorney at Law
JGunnemann@cogunn.com

March 19, 2021

VIA Overnight Delivery and Email (chris@tmsnc.com)

TMS NC, Inc. (f/k/a M&C Business Consulting Inc.)
c/o Chris Collins
12505 Richmond Run Dr.
Raleigh, NC 27614

TMS NC, Inc. (f/k/a M&C Business Consulting Inc.)
c/o Chris Collins
3021 Berks Way Ste 202
Raleigh NC, 27614

Re:   INSPECTION DEMAND;
      CEASE AND DESIST DEMAND;
      DEMAND FOR PRESERVATION OF DOCUMENTS

Dear Mr. Collins:

This firm has been retained by Total Merchant Services, LLC ("TMS") to investigate and, if necessary, to bring claims against TMS NC, Inc. ("Sales Representative" or "SR") for violations of that certain Sales Representation Agreement (the "Agreement") dated February 20, 2008, as amended by, inter alia, an Addendum to the Agreement dated October 2019 (the "Exclusivity Agreement").[1] This letter follows correspondence from TMS dated February 23, 2021 (enclosed), to which TMS received no response. That letter identified concerns that you are violating the Agreement and the Exclusivity Agreement by marketing, promoting, or selling Competing Programs.

This letter has three purposes. First, we are writing to demand inspection of certain books and records as detailed below and as permitted by the Agreement.

Second, and separately from the concerns regarding Competing Programs, TMS is in receipt of recent correspondence from you threatening to make defamatory statements concerning TMS and its affiliates to various third parties. This correspondence is part of a pattern of unprofessional and harassing behavior towards TMS. As described in more detail below, you are demanded to stop from further harassment of TMS. You are also advised to refrain from any defamatory conduct

---

[1] Capitalized terms not otherwise defined in this letter shall have the meaning ascribed to them in the Agreement and the Exclusivity Agreement.

that could harm TMS or its affiliates. TMS will act to protect its reputation, including seeking damages for any defamatory statements made by you.

Third, as detailed below, you are demanded to retain documents related to TMS's investigation of your conduct and breaches of the Agreement and Exclusivity Agreement.

### DEMAND FOR INSPECTION

In the Agreement, SR promises to allow TMS or its representatives "access to the premises of SR" for the purpose, of among other things, inspecting and making copies of SR's "books, accounts, records and files pertaining to SR's performance of the Services." Agreement, ¶ 4(b). SR further agrees to keep "complete and detailed records relating to the performance of the Services and its obligations under [the] Agreement," which records SR "shall make available upon request of TMS." Agreement, ¶ 4(d).

Pursuant to the provisions of Sections 4(b) and 4(d) of the Agreement, TMS demands that these books and records be made available to TMS and/or its authorized representatives for inspection and copying. TMS reserves the right to investigate all permissible records, but, in particular, TMS demands that SR make available:

- Financial statements, including profit and loss statements and balance sheets, and all other documents showing the assets, liabilities, costs, expenditures, receipts and other such related matters of SR, for the period October 19, 2018, to the present.
- Documents sufficient to identify SR's directors, officers, shareholders, partners, members, or principals.
- Any documents evidencing the financial compensation of SR's directors, officers, shareholders, partners, members, or principals for the period October 19, 2018, to the present.
- Documents evidencing the financial compensation of all of SR's subagents for the period October 19, 2018, to the present.
- A copy of SR's federal, state, and local income tax returns for 2018-2020.
- Since October 19, 2018, correspondence with any Merchants related to the Processing Program or TMS.
- Since October 19, 2018, correspondence with any Merchant or business related to Card processing services and programs offered by any processor other than TMS.

2

- Since October 19, 2018, documents evidencing the Card processing services and programs offered to any Merchant, prospective Merchant, or other business by SR or any of SR's subagents.

- Since October 19, 2018, correspondence with any subagent of SR related to Card processing services and programs offered by any processor other than TMS.

- Since October 19, 2018, all account statements for any bank account operated, maintained, or controlled by SR, and all deposit slips, wires, checks, or other evidence of payments into or out of those accounts.

- Since October 19, 2018, a listing (or other evidence) of all merchants SR has signed up for Card processing services or programs with any processor other than TMS.

- Any other books, accounts, records, and files of SR relating to SR's performance of the Services and its obligations under the Agreement for the period October 19, 2018, to the present.

TMS demands that these books and records be available **during the week of April 5, 2021**. Please provide several times during that week that are convenient for an inspection. It is our understanding that the books and records are maintained at 3021 Berks Way, Suite 202, Raleigh, NC 27614. If that understanding is incorrect, then please immediately provide us the address of the location where such books and records are maintained. **If we have not heard back from you with respect to this inspection right by March 31, 2021, we will consider this demand refused, which refusal shall constitute a separate breach of the Agreement.**

### CEASE AND DESIST FROM HARASSING BEHAVIOR AND REFRAIN FROM DEFAMATORY STATEMENTS

TMS and its affiliates are organizations committed to being customer-centric and responsive to customer and agent concerns. To that end, TMS and its affiliates have received, acknowledged, and worked to resolve all reasonable and substantive issues you have raised on behalf of merchants or your own business.

Your communications, though, have gone well beyond raising legitimate, substantive issues affecting merchants or your business. Over the past months (or longer), you have sent numerous unprofessional communications to TMS and its senior leadership that include personal attacks and slurs concerning TMS and its representatives. TMS expects that its business partners—including its sales representatives—conduct themselves professionally and in a manner that reflects positively on the organization. Your pattern of abusive emails to top executives is disruptive to the organization and is inconsistent with the prudent and professional conduct TMS expects from its

3

business partners. It also violates your contractual commitments in your Agreement to perform the Services "in a professional manner" and to refrain from any practice that may be deemed to be potentially injurious to TMS. You are demanded to cease and desist from further harassing communications with senior executives.



Finally, in a March 17, 2021 email, you overtly threaten to make false and defamatory statements concerning TMS and its affiliates to issuing banks, certain Senators, the Consumer Financial Protection Bureau, and other unidentified government bureaus. Specifically, you have threatened to report to these persons and agencies "violation of Visa/MC processing ethics/rules." You imply that unless TMS "protect[s] my interests financially," you "100% intend" to "take it to the next levels." Your March 17 email comes on the heels of previous emails where you have asked or demanded to be excused from your three-year Exclusivity Agreement; and, in context and coupled with your comment about your financial interests, your March 17 email is a threat that you will make these defamatory statements to third parties unless released from your contractual obligations.

TMS and its affiliates have over the course of many months patiently and thoroughly explained to you that their business practices comply with Visa and MasterCard rules and all applicable law. You have received return correspondence directly from senior leadership addressing your concerns and, where individual merchants have experienced an error or problem, TMS or an appropriate affiliate have patiently worked with merchants to address and fix those problems where possible. You have no reasonable basis to accuse TMS or any affiliate of violation of rule or law. Further, we are deeply concerned with your linking your threat of making unsubstantiated defamatory statements "to the next levels" with your compensation. You are hereby warned that TMS and its affiliates will act aggressively to protect their reputations and will take any further extortionary threats seriously. TMS will not release you from your contractual obligations in response to threats to make defamatory statements concerning TMS and, should you follow through with those threats, will vigorously enforce its rights.

4

**DEMAND FOR PRESERVATION OF RECORDS**

TMS's prior letter to you placed you on notice of potential claims against you with respect to the Competing Programs and triggered your duty to preserve evidence. You are demanded to preserve and not to destroy any material that may be related to TMS's potential claims. Such materials include all of the books and records referenced above, but that material is not an exhaustive list of the material that is to be preserved. If SR is aware of any other material that could be of potential relevance to an action against SR—with respect to Competing Programs, your acts of defamation or extortion, or to any other breach of the Agreement or its amendments—you must preserve those materials even if they are not listed here.

Additionally, you must suspend destruction or other disposal of records relating to information that may be relevant to an action by TMS, whether pursuant to records retention policies or otherwise. Moreover, you should issue and distribute a notice instructing any individuals with control over any of the records listed above or any other material that might be related to these disputes to preserve such records for litigation.

Please note that the preservation obligation applies to all forms of data and records, including paper documents; email and other electronic communications; word processing documents; spreadsheets; databases; calendars; telephone logs; internet usage files and network access information; text messages, mobile data; cloud data; Slack messages; chat or other group communication media; video or audio recordings; back-up computer disks and tapes or other backup media; and every other memorialization of information related to the topics set forth above or this dispute. Moreover, some of the material relevant to this case may be in the possession of non-parties, but nevertheless under your "control"; thus, you must take steps to make sure such material is preserved as well.

\* \* \* \* \*

TMS reserves all of its rights and remedies under the Agreement, the Exclusivity Agreement, and any other agreements between or among the parties, and all rights and remedies at law or at equity, against and with respect to SR.

Sincerely,

Josh Gunnemann

Enclosure (Letter of February 23, 2021)

6

# EXHIBIT E

NORTH CAROLINA OFFICE

3326 Durham-Chapel Hill Blvd.
Suite 200A Durham, NC 27707
**Office: 919.680.4577**
**Fax: 888.899.1251**

Email:
nhatcher@hatcherlegal.com

MARYLAND OFFICE

10015 Old Columbia Road
Suite B-215 Columbia, MD 21046
**Office: 443.583.4537**
**Fax: 888.899.1251**

Nichole M. Hatcher, Esq.*

*Licensed to practice in
North Carolina & Maryland



## HATCHER LEGAL
### Attorneys at Law

Wednesday, March 31, 2021

**VIA ELECTRONIC MAIL JGunnemann@cogunn.com; FACSIMILE – 404.600.1624**

Total Merchant Services, LLC
c/o Joshua P. Gunnemann
1201 Peachtree St. NE
Bldg. 400, Ste. 100
Atlanta, GA 30361

           **RE:**         **TMS NC, Inc. – Chris Collins**

Dear Sir/Madame:

      This email is to advise you and your client of TMS NC, Inc.'s representation by Attorney Nichole Hatcher and Hatcher Legal, PLLC. We are in receipt of your "inspection demand" and we must, on behalf of our client, refuse your request at this time.

      As you have cited ¶ 4(b) of the Sales Representation Agreement ("SRA"), you have no doubt read its provision that entitles TMS to make reasonable requests for the inspection of certain "credit reports, (or the authorization to obtain such reports), bank and trade references, financial and other information." See ¶ 4(b). Since a reasonable reading of this paragraph would limit TMS audit authority to an inspection of this material on an annual basis (looking back on the previous year), and only when those requests are made *prior* to February 1, it follows logically that your request for the 2020 financial information of our client is therefore untimely and it is within our right to refuse this request, and any request being made for previous years is outside the authority granted by this provision at any time.

      As for your request under ¶ 4(d) regarding "complete and detailed records relating to the performance of the Services," requests for these documents must be made at "reasonable times and

intervals."[1] As you have placed our client on notice of "potential claims against [them]" this is not a

reasonable time for a request of this sort. TMSNC will maintain its records as required by law.

Please do not hesitate to contact me if you have any questions or wish to discuss this matter

further.

Very truly yours,

Nichole M. Hatcher, Esq.

NMH/rge

cc:    Chris Collins, chris@tmsnc.com
       Monica Collins, monica@tmsnc.com

---

[1] ¶ 4(d), "SR will keep complete and detailed records relating to the performance of the Services and its obligations under this Agreement, which it shall make available upon request of TMS at reasonable times and intervals."